730 F.2d 882
 John R. WILLIAMS, Plaintiff-Appellee,
v.
FEDERAL BUREAU OF INVESTIGATION, William H. Webster,
Director, FBI, New Haven Field Office of the FBI, L. Grey
Brockman, Special Agent in Charge of New Haven Field Office,
FBI, United States Dept. of Justice, Griffin B. Bell,
Attorney General of the United States, Defendants-Appellants.
 No. 476, Docket 83-6204.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 30, 1983.
Decided March 20, 1984.
 
 John R. Williams, New Haven, Conn. (Williams & Wise, New Haven, Conn., on brief), pro se.
 Susan Sleater, Washington, D.C. (J. Paul McGrath, Asst. Atty. Gen., Alan H. Nevas, U.S. Atty., New Haven, Conn., William Kanter, Atty., Appellate Staff Dept. of Justice, Civ. Div., Washington, D.C., on brief), for defendants-appellants.
 Before WINTER and PRATT, Circuit Judges, and METZNER, District Judge.*
 WINTER, Circuit Judge.
 
 
 1
 The Federal Bureau of Investigation ("FBI") appeals from a decision by Magistrate Latimer directing the release of certain information pursuant to the Freedom of Information Act, 5 U.S.C. Sec. 552 (1976) ("FOIA"). Chief Judge Daly adopted and approved his ruling. We reverse and remand.
 
 BACKGROUND
 
 2
 In the late 1960's and early 1970's, the FBI had a continuing investigation of the Black Panther Party ("Panthers"), an organization which advocated violent revolution. In May, 1969 Alex Rackley, a government informer and Panther member, was found murdered. Fourteen members of the Panthers, including its national chairman, Bobby Seale, were arrested, charged and tried for the murder in New Haven, Connecticut.
 
 
 3
 In October, 1969 a group calling itself the Coalition for the Defense of the Panthers ("Coalition") was formed in New Haven. This group announced that its major goals were to:
 
 
 4
 ... counteract, the prejudicial publicity against the Panthers by educating New Haven citizens about the Panther's positive community programs and about the legal rights which they must receive to have a fair trial, and ... to raise money for the legal defense of the Panthers and to carry on the work of the Coalition in the Panthers' behalf.
 
 
 5
 The membership of the Coalition consisted of groups ranging from the Students for a Democratic Society to various community organizations affiliated with Yale University. The FBI began an investigation of the Coalition in October, 1969. It closed its file on May 20, 1971, concluding that the Coalition "[m]embership is still sympathetic to the Panther cause, but they have made no actual attempt to gain membership in the [Black Panther Party]."
 
 
 6
 On October 20, 1977, the plaintiff submitted an FOIA request to the FBI seeking disclosure of all documents concerning the Coalition. The FBI released 94 documents totaling 281 pages. Most of the documents released were from a file in the FBI's New Haven office captioned "The Coalition for the Defense of the Panthers." Some of the documents were copies of materials in the FBI's main file on the Black Panther Party. Although most documents were released in their entirety, some portions were redacted. The redactions were described by the government as necessary to preserve the confidentiality of the identities of confidential sources, the name of an FBI special agent, and matters of personal privacy. On March 13, 1979, plaintiff filed this action seeking release of the withheld information. The magistrate granted plaintiff's motion for summary judgment and was affirmed in all respects by the district court. This appeal followed.
 
 DISCUSSION
 
 7
 The pertinent provision of the FOIA ("Exemption 7") exempts from disclosure:
 
 
 8
 (7) investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings, (B) deprive a person of a right to a fair trial or an impartial adjudication, (C) constitute an unwarranted invasion of personal privacy, (D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source, (E) disclose investigative techniques and procedures, or (F) endanger the life or physical safety of law enforcement personnel.
 
 
 9
 5 U.S.C. Sec. 552(b)(7) (1976).
 
 
 10
 After the FBI sought to withhold the information in question under subcategories (C) and (D), the magistrate determined that the documents were not "compiled for law enforcement purposes" and thus were outside the scope of Exemption 7 entirely. This conclusion was founded upon: (i) the magistrate's factual determination that, while the Panthers were a reasonable subject of a criminal investigation, the Coalition "just could not have been credibly regarded as posing any threat whatsoever of ... any ... criminal offense"; and (ii) his legal conclusion that Exemption 7 applies only when the information sought under the FOIA was collected as a result of a plausible concern on the agency's part that the subject of the investigation might somehow be involved in past or future violations of federal law.
 
 
 11
 We disagree with the magistrate's legal conclusion. We conclude that Congress intended that subcategories (A)-(F) protect from disclosure the described information whether or not the reviewing judicial tribunal believes there was a sound law enforcement basis for the particular investigation. The magistrate's factual finding that the Coalition as founded and operated did not constitute a threat of any federal criminal offense is therefore irrelevant.
 
 
 12
 The original version of Exemption 7 read in its entirety:
 
 
 13
 (7) investigatory files compiled for law enforcement purposes except to the extent available by law to a private party.
 
 
 14
 5 U.S.C. Sec. 552(b), Pub.L. 89-487, 80 Stat. 250 (1967). This broad language was adopted because Congress believed that "[i]t is ... necessary for the very operation of our Government to allow it to keep confidential certain material such as the investigatory files of the Federal Bureau of Investigation." S.Rep. No. 813, 89 Cong., 1st Sess. 3 (1965).
 
 
 15
 In the litigation which followed passage of the FOIA, the D.C. Circuit gave Exemption 7 a sweeping construction.[1] Its decisions were criticized, however, because they were perceived as permitting "the unlimited withholding of files merely by classifying them as investigatory files compiled for law enforcement purposes," Federal Bureau of Investigation v. Abramson, 456 U.S. 615, 621, 102 S.Ct. 2054, 2059, 72 L.Ed.2d 376 (1982), as protecting information compiled where "enforcement proceeding[s] were neither imminent nor likely," id. at 627, n. 11, 102 S.Ct. at 2062 n. 11, and as leading to an overbroad exemption for records of agencies with both administrative and law enforcement functions, as well as the records of the FBI. Some thus concluded that the courts had erected a "stone wall" preventing public access to any material that happened to be placed in an investigatory file. Source Book: Legislative History, Texts and Other Documents (Jt.Comm.Print 1975) 332 (remarks of Sen. Hart) (hereinafter cited as 1975 Source Book).
 
 
 16
 In 1974 Congress responded to these concerns by modifying Exemption 7 in two ways. First, it substituted the word "records" for "files" thereby indicating its intent that the courts should "consider the nature of the particular document as to which the exemption was claimed, in order to avoid the possibility of impermissible 'commingling' by an agency's placing in an investigatory file material that did not legitimately have to be kept confidential." NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 229-30, 98 S.Ct. 2311, 2321, 57 L.Ed.2d 159 (1978). Second, the previously broad privilege for all "law enforcement" "files" was drastically reduced to afford protection only for the six kinds of particularly sensitive information specified in subcategories (A)-(F), when contained in an investigatory "record." Federal Bureau of Investigation v. Abramson, 456 U.S. at 627, 102 S.Ct. at 2062.
 
 
 17
 When Congress adopted the 1974 amendments it neither altered the threshold phrase "compiled for law enforcement purposes" nor indicated that it intended to modify those decisions, see note 1, supra, which treated the phrase as a broad, descriptive classification, the use of which was largely determined by the agency in question. However, it radically changed the phrase's function. Before the amendments, the phrase itself served as a complete shield against release of such information. After the amendments, disclosure of such information is required except where the limited subcategories (A)-(F) apply.
 
 
 18
 While the legal effect has been drastically altered, the meaning of "compiled for law enforcement purposes" continues to be governed by the decisions listed in note 1, supra. Throughout the debate on the 1974 amendments, Congress assumed that all investigatory records of the FBI were compiled for a law enforcement purpose, just as the D.C.Circuit had held. Exemption 7 records thus were referred to as "investigatory records of the FBI." See, e.g. 120 Cong.Rec. 17034 (Remarks of Senator Kennedy), 36878 (Remarks of Senator Bayh), 36879 (Remarks of Senator Mondale). Nothing in the debate suggests that Congress intended the release of FBI records containing one or more of the six protected subcategories of information in the event a court determined such records were compiled in the course of an unwise, meritless or even illegal investigation. Irons v. Bell, 596 F.2d 468, 475 (1st Cir.1979). Senator Hart, sponsor and floor manager of the 1974 amendments, explained that:
 
 
 19
 Our amendment is broadly written, and when any one of the reasons for nondisclosure is met, the material will be unavailable.
 
 
 20
 * * *
 
 
 21
 * * *
 
 
 22
 [T]he amendment protects without exception and without limitation the identity of informers. It protects both the identity of informers and information which may reasonably be found to lead to such disclosure.
 
 
 23
 1975 Source Book 333-34. The decision as to how much to disclose was thus resolved in favor of limiting the absolute protection previously accorded all law enforcement investigatory files to six specific subcategories of information contained in investigatory records, the disclosure of which, Congress believed, would clearly impair law enforcement functions. "[C]ompiled for law enforcement purposes" continues to describe the general type of record for which the exemption is designed and is not a restriction on the use of the exemption.
 
 
 24
 Information falling within subcategories (A)-(F) was thus given absolute protection as a consequence of Congress' judgment that the efficient operation of federal law enforcement agencies would be impaired by the disclosure of such information. The interpretation adopted by the magistrate vitiates this purpose in two ways. First, it allows disclosure to turn on the vagaries of judicial hindsight as to the merits or wisdom of an investigation. Such judgments involve rank speculation as to what facts should have been so immediately obvious to law enforcement personnel in what are often fluid circumstances as to make any further inquiry foolish. Moreover, these judgments are reached well after it is known that the investigation came to nought and are prone to be based on hindsight alone. Second, the magistrate's interpretation also allows disclosure to turn on an agency's filing practices. An investigation may well consist largely of compiling materials already in several agency files and placing copies in a single file under a new title. Copies of documents from a well-founded investigation may thus easily find their way into a file of a fruitless investigation.
 
 
 25
 For example, in the instant case, the Coalition investigation admittedly came to nought, the resulting file consisting largely of collections of newspaper articles. However, in the course of the Coalition investigation, certain documents from the main investigatory file on the Panthers which refer to the Coalition were quite logically cross-filed with the Coalition file. The magistrate's decision thus leads to the wholly anamolous result that documents which are protected from disclosure under subcategories (A)-(F) when sought under the rubric the "Panther investigation," see Pratt v. Webster, 673 F.2d 408 (D.C.Cir.1982), may be obtained when sought as the "Coalition investigation."
 
 
 26
 We believe such a result wholly at odds with the purposes of Exemption 7. It subjects informants to revelation and possible reprisals and threatens private citizens with the exposure of personal secrets whenever a magistrate or district judge determines an investigation by a law enforcement agency to have been unfounded. This is so even when the informant or citizen is helping the FBI in an investigation acknowledged to have important law enforcement purposes since that investigation may be related to one found after the fact to be meritless because documents relating to both may be cross-filed.
 
 
 27
 We believe that subcategories (C) and (D) are of virtually no assurance to persons who desire confidentiality before dealing with the FBI unless the protection afforded is absolute. The mere possibility of compelled disclosure of such information under the FOIA will, we believe, substantially impair federal law enforcement. Since the magistrate's decision introduces a substantial degree of randomness in the protection offered, its effect would be exactly contrary to the result Congress wanted to achieve. Our construction of Exemption 7 substantially accords with that adopted by the First and Eighth Circuits, Kuehnert v. FBI, 620 F.2d 662 (8th Cir.1980); Irons v. Bell, supra.
 
 CONCLUSION
 
 28
 For the foregoing reasons, we hold that FBI investigatory records are protected from disclosure so long as they fall within one of the six protected subcategories of Exemption 7. To the extent the information withheld in the instant case is of the kind protected by Exemptions 7(C) and 7(D), it need not be disclosed. If doubt exists, the documents may be examined in camera to determine whether Exemption 7 was properly invoked. Irons v. Bell, supra at 476.
 
 
 29
 We reverse and remand for proceedings consistent with this opinion.
 
 
 
 *
 Hon. Charles M. Metzner, of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 See, e.g., Center for National Policy Review on Race and Urban Issues v. Weinberger, 502 F.2d 370 (D.C.Cir.1974); Ditlow v. Brinegar, 494 F.2d 1073 (D.C.Cir.) (per curiam), cert. denied, 419 U.S. 974, 95 S.Ct. 238, 42 L.Ed.2d 188 (1974); Aspin v. Department of Defense, 491 F.2d 24, 30 (D.C.Cir.1973); Weisberg v. United States Dept. of Justice, 489 F.2d 1195, 1198 (D.C.Cir.1973), cert. denied, 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974)