DECISION
This Access to Public Records matter is before the Court on plaintiffs, the Providence Journal Company (Journal), Motion for Summary Judgment and on defendant's, the Rhode Island Attorney General, Cross-Motion for Summary Judgment pursuant to Super. R. Civ. P. 56.
Facts/Travel
On October 31, 1996, the Journal wrote to the Attorney General's office and requested access to the records of "all gun permits issued by the Rhode Island attorney general's office for the years 1994, 1995 and thus far in 1996." The letter further stated that ". . . this information was provided to reporters under attorney general James O'Neil, and has been selectively denied in individual requests by the newspaper's reporters to General Pine." As justification for the request, the Journal stated that "it is in the legitimate public interest for citizens to know who has gun permits."
On November 15, 1996, the Department of the Attorney General denied the request. As grounds for the denial, Special Assistant Attorney General, Lisa Dinerman, stated that the names of permit holders are not public information under the Access to Public Records Act. R.I.G.L. 1956 § 38-2-1 et seq. (APRA). Specifically, Ms. Dinerman stated:
 ". . . information concerning gun permits is maintained by the Department's Bureau of Criminal Investigation. Such information is maintained for criminal law enforcement purposes including, but not limited to, determining whether or not an individual is lawfully possessing a gun, and the ownership of a gun found to have been used in the commission of a crime. In addition, there are many other case-specific situations in which these records are used for criminal law enforcement."
The Journal was advised that the decision was final and that should the Journal wish to appeal, it should file a civil action with this Court.
On December 4, 1996, the Journal filed suit against the Attorney General seeking access to the disputed records. The Journal subsequently filed a Motion for Summary Judgment. In its Memorandum in Support of the Motion, the Journal stated that "[s]uch documents should include the identity of licensees, and information relating to the application and the licensing process: applications, letters of rejection, letters of acceptance, reasons for rejecting the applications and reasons for granting the applications."[1]
The Attorney General objected to the plaintiffs motion and filed a Cross-Motion for Summary Judgment. As grounds for the motion, the Attorney General asserts that the requested records are not obtainable under either the APRA or under common law. Under the APRA, the Attorney General claims that the records are exempt from public disclosure because (a) they are records maintained by a law enforcement agency for criminal law enforcement purposes; and, (b) they are records identifiable to individual applicants for benefits. Under common law, the Attorney General asserts that the Journal's stated interest in accessing the permit information does not outweigh public safety and confidentiality concerns.
The Attorney General, accompanying the motion, filed copies of gun permit application and renewal forms and six affidavits from various law enforcement personnel. The application forms require information which include the applicant's name, address, place of employment, home and work phone number, social security number, citizenship, and a statement of need for the permit. In addition, an applicant must answer questions concerning the applicant's history of prior criminal arrests, plea bargains, convictions, and treatment for prior mental illness. Also, the applicant must attach a recent photograph, two types of positive identification and a full set of fingerprints submitted on a FBI Fingerprint Applicant Card.
The affidavits basically outline the procedures that the Office of the Attorney General follows in order to grant a gun permit. These procedures include checking each applicant against the state criminal history files (a "BCI" check) and against the FBI maintained "Triple I Index"; checking the applicant against the Attorney General's database for the existence of restraining orders and checking through the court RIJSS for any criminal arrests which may not have been supported by fingerprint cards. The affidavits also state that any negative findings regarding an applicant's criminal history, the existence of restraining orders against him/her, or other discrepancies in the applicant's background, including prior treatment for mental illness, constitute grounds for denying the application and/or the renewal application.
In addition to outlining the application procedures, the affiants express concern for the personal safety of gun permit holders, should gun permit information become public. As the basis for their concerns, the affiants note that many gun permit holders have unlisted phone numbers and don't include their names and addresses in the phone book; some permit holders have had serious physical threats made to their personal safety; the privacy interests of the applicants could be seriously compromised by public access to their fingerprint records; and, because a permit record contains so much personal identifying information, the applicant's identity could be stolen. The affiants also expressed concern that public access to gun permit information may result in permit holders being the targets of crime.
On April 9, 1998, this Court heard oral arguments from both parties on the Cross-Motions for Summary Judgment. At the hearing, the Journal stated that for purposes of its motion, the Journal was limiting its request to the same information previously released by Attorney General O'Neil, namely a list of all valid permits to carry firearms, including the name, sex, date of birth, and city and state of residence of the permit holder, as well as the permit number and expiration date of permit.
Summary Judgment
Summary judgment is a drastic remedy and should be cautiously applied. Boland v. Town of Tiverton, 670 A.2d 1245, 1248 (R.I. 1996); Hydro-Manufacturing, Inc. v. Kayser-Roth Corp,640 A.2d 950, 954 (R.I. 1994). When a trial justice is ruling on a motion for summary judgment, the only question before him or her is whether there is a genuine issue of any material fact that must be resolved. Golderese v. Suburban Land Co., 590 A.2d 395, 396 (R.I. 1991). Summary judgment should be granted only if an examination of all the pleadings, affidavits, admissions, answers to interrogatories, and other materials, viewed in a light most favorite to the party opposing the motion, reveals no genuine issue of material fact. Nichola v. John Hancock Mutual LifeInsurance Co., 472 A.2d 945, 947-48 (R.I. 1984).
A party opposing a motion for summary judgment has an affirmative duty to set forth specific facts that show that there is a genuine issue of material fact to be resolved at trial.Ouimette v. Moran 541 A.2d 855 (R.I. 1988). Thus, "[a] litigant opposing a motion for summary judgment has the burden of proving by competent evidence the existence of a disputed material issue of fact and cannot rest upon mere allegations or denials in the pleadings, mere conclusions, or mere legal opinions." ManningAuto Parts, Inc. v. Souza, 591 A.2d 34, 35 (R.I. 1991).
Access to Public Records
The Journal argues that the APRA and the common law both mandate the release of the requested gun permit information and that Summary Judgment should be granted in its favor. The Attorney General disagrees and asserts that the requested records are not obtainable under either the APRA or under the common law and that, consequently, his Cross-Motion for Summary Judgment should be granted.
Purpose of the APRA
"With the passage of chapter 2 of title 38 (Access to Public Records Act or APRA), the Rhode Island Legislature enhanced the First Amendment right of the public and the press to know and have access to information held by various public agencies."Pawtucket Teachers Alliance Local No. 920, AFT, AFL-CIO v. Brady,556 A.2d 556, 558 (R.I. 1989) (citing The Rake v. Gorodetsky,452 A.2d 1144, 1146-47 (R.I. 1982)). The stated purpose of the Act provides:
 "The public's right of access to records pertaining to the policy making responsibilities of government and the individual's right to dignity and privacy are both recognized to be principles of utmost importance in a free society. The purpose of this chapter is to facilitate public access to governmental records which pertain to the policy making functions of public bodies and/or are relevant to the public health, safety, and welfare. It is also the intent of this chapter to protect from disclosure information about the particular individuals maintained in the files of public bodies when disclosure would constitute an unwarranted invasion of personal privacy." R.I.G.L. 1956 § 38-2-1.
This language "clearly discloses that it was the intention of the General Assembly to guarantee the public's right to access to records that pertain to the policy-making responsibilities of government and are relevant to the public health, safety and welfare." Charlesgate Nursing Center v. Bordeleau, 568 A.2d 775, 777 (R.I. 1990). "It was also the intent of the Legislature to protect from disclosure information about particular individuals whose records are maintained in the files of public bodies when disclosure would constitute an unwarranted invasion of privacy." Id. "Generally, the APRA was intended to open up various state government documents to inspection by private citizens and news-gathering entities in order to enhance the free flow of information . . . [APRA exemptions] should usually be construed narrowly so as to further the legislative purpose of facilitating public access to governmental records." Hydron Laboratories,Inc., v. Department of the Attorney General, 492 A.2d 135, 137 (R.I. 1985).
The United States Supreme Court has recognized that the public's right to know and have access to information is an essential part of the First Amendment. The Rake v. Gorodetsky,452 A.2d 1144, 1146 (R.I. 1982). Through the Freedom of Information Act (FOIA), 5 U.S.C. § 552, Congress has enhanced this First Amendment interest by creating a clear right in the public and the press to have access to information held by the government. Id. The APRA is modeled on the federal act. See RhodeIsland Federation of Teachers, AFT, AFL-CIO v. Sundlun,595 A.2d 799, 802-803 (R.I. 1991); Pawtucket Teachers Alliance Local No.920, 556 A.2d at 558, n. 3; Providence Journal Company v. Kane,577 A.2d 661, 664 (R.I. 1990). When a Rhode Island statute is modeled on a federal statute, Rhode Island courts "should follow the construction put on it by the federal courts, unless there is a strong reason to do otherwise." Krikorian v. Rhode IslandDepartment of Human Services, 606 A.2d 671, 674 (R.I. 1992).
The FOIA was designed to create a broad right of access to "official information." United States Department of Justice v.Reporters Committee for the Freedom of the Press, 489 U.S. 769, 772, 109 S.Ct. 1469, 1481, 103 L.Ed 2d 793 (1989). Whether disclosure of a private document is warranted must turn on the nature of the requested document and its relationship to the basic purpose of the Freedom of Information Act to open agency action to the light of public scrutiny rather than on the particular purpose for which the document is being requested. Id
Official information that sheds light on an agency's performance of statutory duties falls squarely within that statutory purpose. Id. 489 U.S. at 773, 109 S.Ct. at 1481-1482, 489 L.Ed. 2d at 795-796. That purpose, however, is not fostered by disclosure of information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct. Id.
As the basis for its request, the Journal stated that it is in the legitimate public interest for the public to know who has a gun permit. At oral argument, the Journal expressed concern over the amount of discretion given to the Attorney General in deciding who qualifies for a gun permit and asserted that release of gun permit information would provide the public with the means of overseeing how this discretion is applied.
The Firearms Act
In interpreting the Firearms Act, R.I.G.L. § 1956 11-47-1 et seq., our Supreme Court has stated that "[w]hile it is in general nonrestrictive as to the right of persons generally to purchase, own, carry, transport or have in their possession or control most kinds of firearms, some of its provisions are prohibitory." Statev. Storms, 112 R.I. 121, 125, 308 A.2d 463, 465 (1973). The Legislature, "in the interest of public safety and welfare was empowered to enact such legislation." Id. 112 R.I. at 126, 308 A.2d at 466. "[T]he goal of the Legislature was to prevent criminals and certain other persons from acquiring firearms generally and hand guns in particular without at the same time making unduly difficult such acquisition for other members of society." Id. 112 R.I. at 127, 308 A.2d at 466. "To accomplish its purposes, the Legislature, among other things, established licensing procedures and delineated broad parameters within which those selected by it might determine the facts upon which the right to be licensed to carry a handgun hinged." Id.
Under the Firearms Act, the Attorney General is statutorily empowered to issue licenses and permits to carry firearms. R.I.G.L. § 1956 11-47-18. The statute specifically states:
 "The attorney general may issue a license or permit to any person twenty-one (21) years of age or over to carry a pistol or revolver, whether concealed or not, upon his or her person upon a proper showing of need . . . ." R.I.G.L. § 11-47-18.
In order to obtain a permit, an applicant must fill out the required application forms and submit documentation such as a recent photograph, two types of positive identification and a full set of fingerprints submitted on a FBI Fingerprint Applicant Card. After receiving this information, the Attorney General Department's Bureau of Criminal Investigation conducts several background checks in order to determine whether or not the permit should be granted. In the process of making these checks, the Bureau of Criminal Investigation accesses the databases of various criminal and court files.
Scope of the APRA Section 38-2-3 of the APRA states:
 "Except as provided in § 38-2-2(4), all records maintained or kept on file by any public body, whether or not those records are required by any law or by any rule or regulation, shall be public records and every person shall have the right to inspect and/or copy those records at such reasonable time as may be determined by the custodian thereof. R.I.G.L. § 38-2-3(a).
The statute defines a public record as:
 "all documents, papers, letters, maps, books, tapes, photographs, films, sound recordings, or other materials regardless of physical form or characteristics made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency. R.I.G.L. § 38-2-2(4)(i).
It is clear from this language that the records requested by the Journal are public records. Gun permit information is made or received by the Attorney General's Office pursuant to law or in connection with the official business of issuing gun permits. This information is then maintained or kept on file by the Attorney General's Office. As gun permit records fall within the definition of a public record, the Attorney General's Office must make such information available for public inspection under the APRA unless it exempted, i.e., the records are deemed not public by statute.
Non-Public Records
Although the basic policy of the Act is in favor of disclosure, "the dual purpose of the APRA makes clear that the Legislature did not intend to bestow upon the public carte blanche access to all publicly held documents." (emphasis in the original). Pawtucket Teachers Alliance, 556 A.2d at 558. "The Legislature's desire to limit the accessibility of certain documents in order to protect individuals from unwarranted invasions of privacy and to avoid the disclosure of confidential information is further evidenced by the numerous exceptions contained in § 38-2-2." Id. (citing Hydron Laboratories, Inc, 492 A.2d at 137)). See also, Pawtucket Teachers Alliance, 556 A.2d at 559 (Section 38-2-2 is designed to protect from public disclosure information which is highly personal and intimate in nature).
The Attorney General maintains that under the APRA, gun permit records are deemed not public by statute because they are records maintained by a law enforcement agency and they are records identifiable to individual applicants for benefits. Section 38-2-10 imposes the burden of proof upon the Attorney General to demonstrate that gun permit records can be properly withheld from public inspection. Rhode Island Federation ofTeachers, 595 A.2d at 801.[2]
 (a) Records Identifiable to an Individual Applicant forBenefits
The Attorney General asserts that a gun permit is a "benefit" within the meaning of Section 38-2-2 of APRA, which states:
 "For the purposes of this chapter, the following records shall not be deemed public:
 "(A)(I) All records which are identifiable to an individual applicant for benefits, clients, patient, student, or employee; including, but not limited to, personnel, medical treatment, welfare, employment security, pupil records, all records relating to client/attorney relationship and to a doctor/patient relationship, and all personal or medical information relating to an individual in any files, including information relating to medical or psychological facts, . . . ." R.I.G.L. § 38-2-2(4)(i)(A)(I).
The Attorney General argues that "[j]ust like other benefits, a gun permit is a privilege or entitlement" and that "[I]ike other benefits, the holder of the gun permit has a property interest in the issued permit that is afforded the protection of procedural due process." Defendant's Memorandum, p. 17. The Attorney General notes that he has the statutory discretion to issue or deny gun permits.
 To support his argument that a gun permit is a benefit the Attorney General states:
 "the term "benefits" has no special statutory definition. According to Black's Law Dictionary, the first meaning of the term "benefit" is: "Advantage; profit; fruit; privilege; gain; interest. The receiving as the exchange for promise some performance or forbearance which the promisor was not previously entitled to receive." Defendant's Memorandum, p. 17.
The Attorney General appears to be arguing that since a gun permit is a vested property right in the form of a privilege or entitlement, that, by extension, a gun permit is a benefit for purposes of the exemptions contained in § 38-2-2.
The protections of due process are not triggered unless it can be shown that there has been a deprivation of a protectible liberty or property interest. Fireside Nissan, Inc., v. Fanning,30 F.3d 206, 219 (1st Cir. 1994). "A property interest exists when a person has a "legitimate claim of entitlement" to a benefit." Leone v. Town of New Shoreham, 534 A.2d 871, 874 (1987) (citations omitted). "Licenses granted by the government represent property." Id. In Leone, our Supreme Court found that the plaintiff was entitled to a hearing where the town had failed to renew a license to rent mopeds because continued possession of the license was essential in the pursuit of a livelihood. "[T]he due process clause of the Fourteenth Amendment, which requires notice and an opportunity to be heard before a person can be deprived of a property right, applies to the suspension or revocation of a driver's license." Levesque v. Rhode IslandDepartment of Transportation, 626 A.2d 1286, 1290 (R.I. 1993).
Other jurisdictions have addressed the issue of whether a gun permit is a vested property right which is protected by the Due Process Clause, or whether it is a privilege. Such Courts have concluded that a gun permit is a privilege. "There seems no basis to call [a gun permit] a right particularly in view of [the] state's rigorous gun control policy . . . possession of a handgun license is a privilege rather than a right." Shapiro v. New YorkCity Police Department, 595 N.Y.S.2d 864, 868 (Sup 1993) (finding it unnecessary to furnish a quasi-judicial or formal adversarial hearing before a pistol license is revoked). See also Hernandezv. Department of State, Division of Licensing, 629 So.2d 205
(Fla. App. 3 Dist. 1993) (a firearms license [is] a privilege which create[s] no vested rights); Fullman v. Gradick,739 F.2d 553, 561 (11th Cir. 1984) (no property right in pistol permit when sheriff has discretion to deny license).
As in other jurisdictions, the issuance of a gun permit in Rhode Island requires a discretionary decision to be made by the issuing authority, in this case, the Attorney General. In view of this discretion, it appears that a gun permit is a privilege rather than a vested property right. Ultimately, however, despite the Attorney General's argument to the contrary, this distinction may not be relevant to the present analysis. Whether a gun permit is classified as a privilege, entitlement or vested right, does not necessarily mean that it is a benefit for purposes of the APRA exemptions.
As noted above, a driver's license is considered to be a property right which is entitled to due process of the law. Thus, according to the Attorney General's analysis, a driver's license is a benefit which is exempt from disclosure under the APRA. Yet, driver's license records are routinely accessed by members of the public. Indeed, to make clear that such information is to be disclosed upon request, the Motor Vehicle Code provides:
 "The registrar and such officers of the registry as he or she may designate are hereby authorized to prepare under the seal of the registry and deliver upon request a certified copy of the application for operator's license or registration, or operator's license or registration, . . . ." R.I.G.L. 1956 § 31-2-9
In addition:
 "All records of the registry, other than those declared by law to be confidential for the use of the registry, shall be open to public inspection during office hours." R.I.G.L. § 31-2-11(a).
Furthermore:
 "The division of motor vehicles, department of transportation shall upon request furnish registration and license information to the public." R.I.G.L. § 31-2-20.
Although the Firearms Act contains no such specific provisions, given that the entitlement of a driver's license is afforded more protection under the law than that of the privilege of a gun permit, this Court concludes that the Legislature did not intend to give gun permit records more protection from disclosure than that afforded to driver's license records. Therefore, as APRA exemptions must be strictly construed, the exemption contained in R.I.G.L. § 38-2-2(4)(i)(A)(I), which pertains to records identifiable to a particular applicant for benefits, does not apply to gun permit records.
(b) Law Enforcement Records
At oral argument, the Attorney General additionally asserted that gun permit records are law enforcement records which are deemed not public by the APRA. The Attorney General pointed to the gun permit application process as support for this assertion. He noted that detailed background checks are performed by the Bureau of Criminal Investigation, a division of the Department of the Attorney General, in order to determine an applicant's suitability for a gun permit. As part of this process, the Bureau reviews an applicant's criminal history by checking the applicant against (1) the state criminal history files (a BCI check); (2) the FBI Triple I Index; (3) the Attorney General's database; and, (4) the court RIJSS. In addition, the Bureau investigates any prior treatment for mental illness that the applicant may have received. The Attorney General asserts that the background information consulted during such an investigation, coupled with the investigation process itself, brings gun permit records under the law enforcement exemption contained in R.I.G.L. §38-2-2(d)(4).[3]
In contrast, the Journal argues that gun permit records are maintained only for licensing purposes and that although they may be useful as a source of information for criminal law enforcement, the records are not, of themselves, criminal law enforcement records. This Court agrees.
 Section 38-2-2(4)(i)(D) of the APRA exempts:
 "All records maintained by law enforcement agencies for criminal law enforcement and all records relating to the detection and investigation of crime, including those maintained on any individual or compiled in the course of a criminal investigation by any law enforcement agency but only to the extent that the disclosure of the records or information (a) could reasonably be expected to interfere with investigations of criminal activity or with enforcement proceedings, . . . (c) could reasonably be expected to constitute an unwarranted invasion of personal privacy, . . . or (f) could reasonably be expected to endanger the life or physical safety of any individual; . . . ." R.I.G.L. § 38-2-2(4)(i)(D)
The Attorney General claims that the language of this section is unambiguous and should be given its plain and obvious meaning.[4] He asserts that punctuation marks used in a statute, such as the use of the semi-colon to enumerate a series of types of records deemed not to be public, indicates the legislative intent to treat the each record separately. As a consequence of this separate treatment, the Attorney General claims that the statute enumerates four distinct types of law enforcement records and that the first two constitute exemptions which are directly applicable to gun permit records. The Attorney General asserts that these exemptions are (1) law enforcement "maintenance" records, namely all records maintained by a law enforcement agency for criminal law enforcement, and (2) "investigatory" records, namely all records relating to the detection and investigation of crime.
Recently, our Supreme Court refused to consider whether or not a request concerning disciplinary actions against police officers could be considered "since the conditions precedent set forth in § 38-2-2(d)(4), as amended, namely that records be maintained for criminal law enforcement or relate to the detection and investigation of crime, [had] not been satisfied."Direct Action for Rights and Equality v. Gannon, No. 96-369-A, slip op. at 11(R.I. filed June 4, 1998) (emphasis added). The Attorney General, thus, correctly recognizes that the first sentence of § 38-2-2(d)(4) contains two distinct conditions.
In 1997, however, the Legislature removed the semi-colon to which the Attorney General refers. If the use of the semi-colon to enumerate a series of types of records deemed not to be public does in fact indicate the legislative intent to treat the each record separately, then removal of the semi-colon, likewise, indicates a legislative intent to treat the previously distinct categories as a single category. Like the Attorney General, inDirect Action for Rights and Equality, supra, our Supreme Court refers to the APRA as it existed prior to the 1997 amendment which removed the semi-colon. Notwithstanding, whether or not this provision contains one or two condition(s) is irrelevant for purposes of the present analysis since, after reviewing the record, this Court finds that the Attorney General has not satisfied his burden of showing that gun permit records meet the condition(s) contained in § 38-2-2(4)(i)(D).
Although our Supreme Court determined that the conditions precedent set forth in § 38-2-2(d)(4) must be satisfied before it can consider the possibility of an unwarranted invasion of personal privacy, it did not provide any guidance as to how these conditions might be satisfied; therefore, this Court must look to Federal Law for direction. The FOIA has a provision which is similar to that contained in the APRA.[5] Various Federal Courts have discussed this so-called law enforcement exemption.
Exemption 7 of the FOIA authorizes disclosure of law enforcement records unless the agency can demonstrate one of six specific harms.[6] Federal Bureau of Investigation v. Abramson,456 U.S. 615, 622, 203 S.Ct. 2054, 2059, 72 L. Ed. 2d 376, 383 (1982). "The language of the Exemption indicates that judicial review of an asserted Exemption 7 privilege requires a two-part inquiry. First, a requested document must be shown to have been an investigatory record "compiled for law enforcement purposes." If so, the agency must demonstrate that release of the material would have one of the six results specified in the Act." Id. 456 U.S. at 622, 203 S.Ct. at 2059-2060, 72 L. Ed. 2d at 383-384. However, "[b]efore the Government may invoke the privilege, it has "the burden of proving the existence of such a compilation for such a purpose." John Doe Agency v. John Doe Corporation,493 U.S. 146, 153, 110 S.Ct. 471, 475, 107 L. Ed. 2d 462, 472 (1989).
Thus, "Exemption 7 requires the Government to demonstrate that a record is "compiled for law enforcement purposes" and that disclosure would effectuate one or more of the six specific harms." Id. 493 U.S. at 156, 110 S.Ct. at 477, 107 L. Ed. 2d at 474. "The Court looks to the reasons for exemption from the disclosure requirements in determining whether the Government has properly invoked a particular exemption." Id. 493 U.S. at 157, 110 S.Ct. at 478, 107 L.Ed.2d at 474 (finding that information compiled for law enforcement purposes does not lose its Exemption 7 status when summarized in a new document not created for law enforcement purposes).
At the hearing, the Attorney General argued that release of gun permit records could reasonably be expected to interfere with investigations of criminal activity or with enforcement proceedings. Although the Attorney General averred that he uses the records in order to prosecute felonies, he was unable to state what percentage of gun permit holders have been involved in felonies and admitted that the numbers were small. The Attorney General submitted various affidavits with his Motion to support these contentions.
The Journal discounted these arguments as irrelevant. The Journal argued that release of the records would not compromise any law enforcement activities, and that the Attorney General had not shown any evidence that the records were being used for actual, ongoing investigations.
The First Circuit has stated that bare conclusory allegations in an affidavit do not suffice to establish an essential fact concerning the applicability of an FOIA exemption. Irons v. Bell,596 F.2d 468, 471 (1st Cir. 1979). "[T]he requirement of a law enforcement purpose serves as a condition on Exemption 7 when an agency has both administrative functions and enforcement functions. Id. at 473. "Granted that the [U.S.] Attorney General may designate certain investigatory files as having been compiled for law enforcement purposes, his ipse dixit does not finalize the matter, for there remains the judicial function of determining whether that classification be proper." Weisberg v.U.S. Department of Justice, 489 F.2d 1195, 1202 (D.C. Cir. 1973)cert. denied 416 U.S. 993, 94 S.Ct. 2405, 40 L. Ed. 2d 772 (1974) Where a district court can conclude that the Attorney General's designation and classification are correct, the Freedom of Information Act requires no more. Id.
The First Circuit additionally determined that "investigatory records of law enforcement agencies are inherently records compiled for `law enforcement purposes."' Irons v. Bell, 596 F.2d at 475 (finding the FBI to be such an agency). However, "Exemption 7" was designed to eliminate "blanket exemptions" for Government records simply because they were found in investigatory files compiled for law enforcement purposes. Curranv. Department of Justice, 813 F.2d 473, 475 (1st Cir. 1987) (citing NLRB v. Robbins Tire and Rubber, 437 U.S. 214, 236, 98 S.Ct. 2311, 2323, 57 L. Ed. 2d 159, 174 (1978)). "[An] agency cannot, consistent with the broad disclosure mandate of the Act, protect all its files with the label `investigatory' and a suggestion that enforcement proceedings may be launched at some unspecified future date." Bristol Meyers Company v. Federal TradeCommission, 424 F.2d 935, 939 (D.C Cir. 1970) cert. denied400 U.S. 824, 91 S.Ct. 46, 27 L. Ed. 2d 52 (1970).
Thus, "merely because a piece of paper has wended its way into an investigatory dossier created in anticipation of enforcement action, an agency — even one having a function as sensitive as the FBI — cannot automatically disdain to disclose it." Curran, 813 F.2d at 475. The Curran Court further stated:
 "Although generic determinations are permitted, and the Government need not justify its 7(A) refusal on a document-by-document basis, there must be some minimally sufficient showing . . . s]uch withholdings should be-justified "category-of-document by category-of-document . . . not . . . file — by — file . . . . The chief characteristic of an acceptable taxonomy should be functionality — that is, the classification should be clear enough to permit a court to ascertain "how each . . . category of documents, if disclosed, would interfere with the investigation. Withal, a tightrope must be walked: categories must be distinct enough to allow meaningful judicial review, yet not so distinct as prematurely to let the cat out of the investigative bag." (internal citations omitted). Curran, 813 F.2d at 475.
"[w]here an agency fails to demonstrate that the documents sought relate to any ongoing investigation or would jeopardize any future law enforcement proceedings, Exemption 7(A) would not provide protection to the agency's decision. NLRB v. Robbins Tireand Rubber Company, 437 U.S. at 235, 98 S.Ct. at 2323, 57 L. Ed. 2d at 174 (1978).
In the instant matter, the Attorney General has not shown that gun permit records are compiled specifically for law enforcement purposes. Instead, the evidence shows that the records are compiled in order to facilitate an administrative and discretionary decision concerning the granting of a gun permit to an applicant. Consequently, gun permit records are not law enforcement records for purposes of the exemption contained in R.I.G.L. § 38-2-2(4)(i)(D). As the Attorney General has not demonstrated that an exception to the APRA applies to the Journal's modified request for gun permit records, his Cross-Motion for Summary Judgment must be denied.
The Balancing Test
Our Supreme Court has stated that "in passing the APRA, the General Assembly intended to limit access to certain documents in order to avoid disclosure of confidential information to protect individuals from invasion of their privacy." Providence JournalCompany v. Kane, 577 A.2d 661, 663 (R.I. 1990). "There is no public interest to be weighed in disclosure of nonpublic records." Id. Consequently, "any balancing of interests arises only after a record has first been determined to be a public record." Id. See also Direct Action for Rights and Equality v.Gannon, No. 96-369, slip op. at 13 (R.I. filed June 4, 1998). "Section 38-2-2 is designed to protect from public disclosure information which is highly personal and intimate in nature. Pawtucket Teachers Alliance v. Brady, 556 A.2d at 559 (finding that the potential harm resulting from disclosure of a management study of Pawtucket Elementary School clearly outweighs any perceived benefit that would accrue to the plaintiffs).
The Journal seeks release of a list of all valid permits to carry firearms, including the name, sex, date of birth, and city and state of residence of the permit holder, as well as the permit number and expiration date of permit. The Attorney General has not shown that these records fall under any of the sections which deem records to be non public. As this Court has determined that such records are public, this Court must now apply a balancing test in order to determine whether the records should be released.
In interpreting the FOIA, the federal courts employ a balancing test whereby "[a] court must balance the public interest in disclosure against the interest Congress intended . . .to protect. Reporter's Committee, 489 U.S. at 776, 109 S.Ct. at 1483, 489 L. Ed. 2d at 797. See also, GlobeNewspaper v. Police Commissioner of Boston, 648 N.E.2d 419, 425 (Mass. 1995) (application of the privacy exemption requires a balancing between any claimed invasion of privacy and the interest in public disclosure).[7]
In identifying the existence of privacy interests, consideration should be given to the following: whether disclosure would result in personal embarrassment to an individual of normal sensibilities, whether the materials sought contain intimate details of a highly personal nature, and whether the same information is available from other sources. GlobeNewspaper, 648 N.E.2d at 425. Information such as place of birth, date of marriage, employment history, and comparable data is not normally regarded as highly personal, and yet . . . would be exempt from any disclosure that would constitute a clearly unwarranted invasion of personal privacy. United StatesDepartment of State v. Washington Post Co., 456 U.S. 598, 600, 102 S.Ct. 1957, 1961 72 L. Ed. 2d 358, 364 (1982). "[T]he privacy interest of an individual in avoiding the unlimited disclosure of his or her name and address is significant." National Associationof Retired Federal Employees v. Horner, 879 F.2d 873, 875 (D.C. Cir. 1989). See also, United States Department of Agriculture v.Federal Labor Relations Authority, 836 F.2d 1139, 1141 (8th Cir. 1988) (individuals have "a privacy interest in their home addresses . . . ."); Reporter's Committee, 489 U.S. at 767, 109 S.Ct. at 1478, 489 L. Ed. 2d at 792 (disclosure of records regarding private citizens, identifiable by name, is not what the framers of the FOIA had in mind; individual subjects have a significant privacy interest in their criminal histories). Disclosure of records containing personal details about private citizens can infringe significant privacy interests. Reporter'sCommittee, 489 U.S. at 767, 109 S.Ct. at 1478, 489 L. Ed. 2d at 792.[8]
In Reporter's Committee, the U.S. Supreme Court held as a categorical matter that "a third party's request for law enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy, and that when the request seeks no "official information" about a government agency, but merely records that the government happens to be storing, the invasion of privacy [under Exemption 7(C)] is "unwarranted." United States Department of Justice v. ReportersCommittee for the Freedom of the Press, 489 U.S. at 780, 109 S.Ct. at 1485, 103 L. Ed. 2d at 800 (acknowledging that the availability and dissemination of actual rap sheets to the public is limited in keeping with Congressional intent).
The U.S. Supreme Court has recognized the privacy interest inherent in the nondisclosure of certain information even where the information may have been at one time public. Reporter'sCommittee, 489 U.S. at 767, 109 S.Ct. at 1479, 489 L. Ed. 2d at 792. See also, Globe Newspaper, 648 N.E.2d at 426 (Otherwise private information does not necessarily lose that character by having been at one time placed in the public domain.) The fact that an event is not wholly private does not mean that an individual has no interest in limiting disclosure or dissemination of that information. Reporter's Committee, 489 U.S. at 770, 109 S.Ct. at 1480, 489 L. Ed. 2d. 794. However, "[t]here is no liability for giving publicity to facts about the plaintiffs life that are matters of public record." Id. Clearly there is a substantial difference between the public records that may be found after a diligent search of courthouse files, county archives, or a computerized database, and the information sought in this action. Gannett Satellite Information Network, Inc., v.United States Department of Education, 1990 W.L. 251480, 3 (D.D.C.) (refusing to disclose the names, addresses and social security numbers of loan defaulters).
The Journal appears essentially to be arguing that it is attempting to uncover abuses of discretion by the Attorney General in the granting of gun permits; however, "[w]hen governmental misconduct is alleged as the justification for disclosure, the public interest is insubstantial unless the requester puts forth compelling evidence that the agency denying the FOIA request is engaged in illegal activity and shows that the information is necessary in order to confirm or refute that evidence." Computer Professionals v. United States SecretService, 72 F.3d 897, 905 (D.D.C. 1996). A mere desire to review how an agency is doing its job, coupled with allegations that it is not, does not create a public interest sufficient to override the privacy interests protected by exemption 7(C). Id.
"Conceivably [rap sheet information] would provide details to include in a news story, but in itself, this is not the kind of public interest for which Congress enacted the FOIA . . . [A]lthough there is undoubtedly some public interest in anyone's criminal history, especially if the history is in some way related to the subject's dealing with a public official or agency, the FOIA's central purpose is to ensure that theGovernment's activities be opened to the sharp eye of public scrutiny, not that information about private citizens that happens to be in the warehouse of the Government be so disclosed." Reporter's Committee, 489 U.S. at 774, 109 S.Ct. at 1482, 489 L. Ed. 2d at 796-797. A third party's request for law enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy, and that when the request seeks no "official information" about a government agency, but merely records that the Government happened to be storing, the invasion of privacy is unwarranted. Id. 489 U.S. at 780, 109 S.Ct. at 1485, 489 L. Ed. 2d at 800.
Although "a requestor does not have a right to have his case decided on a hypothetical set of facts that strengthen his position, rather he must see his case succeed or fail on the facts before the court . . . [this] does not require that [the requestor] prove that a scandal exists; it merely requires that a claim of public interest be based on public facts." Beck v.Department of Justice, 997 F.2d 1489, 1494 (D.C. Cir. 1993).
In the instant matter, the Journal asserts that, as justification for its request, it is in the legitimate public interest for citizens to know who has gun permits. In addition, the Journal argues that release of such records would provide the public with a means of overseeing the amount of discretion that the Attorney General employs in deciding who qualifies for a permit.
In Southern New Jersey Newspapers, Inc., v. The Township ofMount Laurel, 660 A.2d 1173 (N.J. 1995) the plaintiff requested access to records of permits for the sale and purchase of firearms issued by law enforcement officers of the defendant Township. The stated purpose of the request was to obtain information relevant to an investigation as to whether the Acting Chief of Police had issued firearms permits without legal authority. While the case was pending, the New Jersey Attorney General adopted regulations which exempted such records from the Right-to-Know-Law, causing the decision to be based upon the common-law right to inspect governmental records.
Similar to the approach or the methodology of the federal courts in FOIA cases, the New Jersey Court stated that "an adequate and informed balancing of interests cannot be performed if the public interest in access is not sufficiently disclosed."Southern New Jersey Newspapers, Inc., 660 A.2d at 1183. In remanding the case, the New Jersey Supreme Court directed its Appellate Division to balance the defendant's interest in confidentiality against the public's interest in disclosure of the requested documents.
The New Jersey Court suggests several factors that a court may consider in performing its balancing function:
 "(1) the extent to which disclosure will impede agency functions by discouraging citizens from providing information to the government; (2) the effect disclosure may have upon persons who have given such information, and whether they did so in reliance that their identities would not be disclosed; (3) the extent to which agency self-evaluation, program improvement, or other decisionmaking will be chilled by disclosure; (4) the degree to which the information sought includes factual data as opposed to evaluative reports of policymakers; (5) whether any findings of public misconduct have been sufficiently corrected by remedial measures instituted by the investigative agency; and (6) whether any agency disciplinary or investigatory proceedings have arisen that may circumscribe the individual's need for the materials." Id. at 1182.
Against these and other relevant factors, the court should balance "the importance of the information sought to the plaintiffs vindication of the public interest." Id.
Although the stated purpose of the Southern New Jersey Newspapers' request was to obtain information relevant to an investigation as to whether the Acting Chief of Police had issued firearms permits without legal authority, the Court found that the record insufficiently defined the public purpose to be advanced by access to the requested documents. Id. at 1183.
The Court advised that in the balancing of interests, "the court will recognize that a basic element of the public interest in disclosure is the desirability of informing the public about the manner in which law-enforcement officers perform their responsibility in licensing applicants from among the general public to purchase handguns and rifles. Unquestionably the proper issuance of firearms licenses only to persons qualified to receive them is a matter of fundamental public concern." Id. In addition, the Court stated that:
 "The court will balance the public interest, augmented by whatever additional disclosures and allegations plaintiff may proffer, against any competing interests that defendants have advanced. Those interests include maintaining the confidentiality of personal information in an applicant's investigative file, preventing increased black-market sales of unregistered firearms, ensuring the candor of an applicant and his or her references, denying the criminal elements in our society the opportunity of obtaining "shopping lists" of names and addresses of persons who own firearms, and decreasing the chilling effect of public disclosure on qualified persons who wish to buy a firearm." Id.
Finding that New Jersey's employing a balancing test involving an analysis of factual issues is appropriate for this Court, the Journal's Motion for Summary Judgment must be denied.
The Journal's Modified Request
In its Memorandum, the Journal stated that "[s]uch documents should include the identity of licensees, and information relating to the application and the licensing process: applications, letters of rejection, letters of acceptance, reasons for rejecting the applications and reasons for granting the applications." Later, at the hearing, the Journal stated that for purposes of its motion, the Journal was limiting its request to the same information previously released by Attorney General O'Neil, namely a list of all valid permits to carry firearms, including the name, sex, date of birth, and city and state of residence of the permit holder, as well as the permit number and expiration date of permit.
The Attorney General objected to the modified request on the basis that he does not believe that such a record ever existed and that he does not have a duty to create a new record under the statute.
This Court requested that the Attorney General determine whether or not such a record exists, and if not, to inform the Court what it would take to program such a printout. In a letter to the Court, dated April 16, 1998, Special Assistant Attorney General, Elisabeth Wallace, responded to the request by stating that
 "the data regarding gun permits is contained in the Department's Wang system. Apparently, a push of the "print screen" button will not produce the data the Providence Journal seeks. I am told that an "extract" program would have to be conducted by a member of our staff, essentially reorganizing the data to fit the request. This means that an extract program would have to be conducted each and every time a subsequent request for the same or different information is made. Currently, the Department does not have anyone on staff who is trained to conduct such a program."
The objection to creating a new record was then reasserted.
In response, the Journal, in a letter dated April 22, 1998, acknowledged that the APRA does not require the Attorney General to create new documents, but stated that it "simply asks that data already contained on the Attorney General's computer system be transferred to the Journal." The Journal further stated that this "only requires that a subset of existing information not be transferred when other existing data, such as the names, and permit numbers, is transferred."
Section § 38-2-4 of the APRA states that
 "(a) Subject to the provisions of § 38-2-3, a public body must allow copies to be made or provide copies of public records . . . .
 (b) A reasonable charge may be made for the search or retrieval of documents." R.I.G.L. § 38-2-4.
Section 38-2-3 states
 "Any public body which maintains its records in a computer storage system shall provide a printout of any data properly identified." R.I.G.L. § 38-2-3(e).
However,
 "Nothing in this section shall be construed as requiring a public body to reorganize, consolidate, or compile data not maintained by the public body in the form requested at the time the request to inspect the public records was made." R.I.G.L. § 38-2-3(f).
The Attorney General argues that satisfaction of the Journal's modified request would require him to compile a list in violation of R.I.G.L. § 38-2-3(f) and cites to Gabriels v. Curiale, 628 N.Y.S.2d 882 (1995) in support of his objection.
In Gabriels, the respondent conceded that although the relevant tracking and approval information sought by the petitioner existed within the Department's database, accommodation of the petitioner's request would require it to create new records through a "computer run." Gabriels v. Curiale,
628 N.Y.S.2d at 883. The New York court held that the state's freedom of information law "does not require the Department to create new records, nor develop a program to accomplish this task for the purpose of complying with the petitioner's request." Id.But see Family Life League v. Department of Public Aid,493 N.E.2d 1054, 1059 (Ill. 1986)(remanding a case back to the circuit court to set a reasonable amount of time for the defendants to prepare a new program for the purpose of deleting confidential information furnishing the requested information, where the plaintiffs agreed to pay the reasonable cost of exercising their rights.
The Journal asserts that unlike in Gabriels, where a computer operator would have been required to create new records by printing out the requested information, in the instant matter, no documents would have to be printed out or otherwise generated. The Journal asserts that it simply seeks the transfer of existing data from one computer system to another.
It is clear from the statute that the Attorney General is not required to create new records in order to satisfy a request. However, the APRA also states that
 "any reasonably segregable portion as determined by the chief administrative officer of the public body of a public record excluded by this section shall be available for public inspections after the deletion of the information which is the basis of the exclusion, if disclosure of the segregable portion does not violate the intent of this section." R.I.G.L. 38-2-2(4)(ii).
"The fact that defendants may have to search numerous records to comply with [a] request and that the net result of complying with the request will be a document the agency did not previously possess is not unusual in FOIA cases nor does this preclude the applicability of the Act." Disabled Officer's Association v.Rumsfeld, 428 F. Supp. 454, 456 (D.C. 1977). "In determining segregability, courts must construe the exemptions narrowly with the emphasis on disclosure . . . Any agency may withhold information only if it is so interspersed with exempt material that separation by the agency, and policing of this by the Courts would impose an inordinate burden . . . [N]on exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." Church of ScientologyInternational v. United States Department of Justice,30 F.3d 224, 228 (1st Cir. 1994).
In support of its argument, the Journal correctly noted that the mere deletion of names, addresses and social security numbers does not result in an agency's creation of a whole new record.See Long v. United States Internal Revenue Services,596 F.2d 362, 366 (9th Cir. 1979). See also Bowie v. Evanston CommunityConsolidated School District No. 65, 538 N.E.2d 557, 561 (Ill. 1989) ("[d]eleting information from a record does not create a "new" record, even if all but one or two items of information have been deleted").
In Rumsfeld, the Federal District Court of the District of Columbia stated that "had the plaintiff requested the files and records . . ., with all the information deleted save [the requested information], this request would clearly be one for existing records; that plaintiff phrased its request in a somewhat different form does not affect the substance of the request." Disabled Officer's Association v. Rumsfeld, 428 F. Supp. 454, 457 (D.C. 1977). In interpreting Rumsfeld, the Comment section of the Unifomm Information Practices Code (U.L.A.) § 2-102 noted that
 "As a general rule, [R.I.G.L. § 38-2-3(f)] should be invoked selectively because the requester has the option of having the full record system duplicated . . . If that option is taken, the agency under [R.I.G.L. § 38-2-2(4)(ii)] would have the burden of screening all records for non-disclosable material. The costs of duplication, while imposing, might not be great enough to discourage the requester. Thus the agency might find it easier to produce the compilation than to screen the records from which the compilation would have to be derived." Uniform Information Practices Code (U.L.A.) § 2-102.
In the instant matter, it is clear that the Attorney General is not required to create new records. It is equally clear that, after performance of the balancing test, if this Court find that the Journal is entitled to access any of the records that it has requested, the Attorney General must redact all exempt portions from said gun permit records. For purposes of conforming with the Journal's modified request, it is entirely up to the Attorney General whether he chooses to manually redact material or whether he prefers to prepare a computer program in order to accomplish the same end result; however, the fact that the Attorney General may have to reprogram the computer will not serve as a bar to providing accessible gun permit records.
For the above reasons, the Journal's and the Attorney General's Motions for Summary Judgment are denied. Counsel shall prepare appropriate orders for entry.
[1] In addition to its Memorandum, the Journal attached several exhibits. Exhibit Two is a printout which the Journal states that it received from the Attorney General's office in May 1989. The printout purports to list all persons who had valid permits to carry firearms at the time of the document and includes the name, sex, date of birth, city and state of residence, permit number and expiration date of permit. In Exhibit Three, Plaintiff's Answers to Interrogatories, the Journal asserts that over the past twelve years, various police departments, and on two occasions, the Attorney General's Office, released gun permit information about specific named individuals.
[2] Section 38-2-10 states: "In all actions brought under this chapter, the burden shall be upon the public body to demonstrate that the record in dispute can be properly withheld from public inspection under the terms of this chapter."
[3] The Attorney General's Memorandum cites to R.I.G.L. §38-2-2(d)(4). This section was reenacted in 1997 by P.L. 1997 ch. 326 § 1 and redesignated as R.I.G.L. § 38-2-2(4)(i)(D).
[4] The language of the statute cited by the Attorney General reads "All records maintained by law enforcement agencies for criminal law enforcement; and all records relating to the detection and investigation of crime, including . . . ." R.I.G.L. § 38-2-2(d)(4)
[5] U.S.C. § 552(b)(7) exempts:
 "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings . . . (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, or (F) could reasonably be expected to endanger the life or physical safety of any individual.
[6] See footnote 5 supra.
[7] This test is very similar to the one employed under the common law right to inspect and copy public records where "the common law right of access involves a two step inquiry. First the court must decide whether the document sought is a public record. If the answer is yes, then the court should proceed to balance the government's interest in keeping the document secret against the public's interest in disclosure." Washington Legal Foundationv. United States Sentencing Commission, 89 F.3d 897, 902 (D.C. Cir. 1996).
[8] Interestingly, our Supreme Court, using the personnel
exemption for guidance, instructed the Superior Court to redactnot only the names of the police officer employees accused of misconduct, but also the names of non-employee, civiliancomplainants. Direct Action for Rights and Equality, No. 96-369, slip op. at 9-10. This action lends support to the idea that, like the Federal Law, Rhode Island law recognizes that an individual has a privacy interest in his or her name.